# FILED

10/04/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0370

DA 21-0370

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 190

HAMLIN CONSTRUCTION AND
DEVELOPMENT COMPANY INC., a
Montana Corporation; JERRY HAMLIN
and BARBARA HAMLIN, Individually and
as TRUSTEES OF THE HAMLIN FAMILY
REVOCABLE LIVING TRUST,

        Plaintiffs and Appellants,

   v.

MONTANA DEPARTMENT OF TRANSPORTATION;
JOHN DOES 1-5; JANE DOES 1-5; ABC ENTITIES,
ORGANIZATIONS OR AGENCIES 1-5,

        Defendants and Appellees.

APPEAL FROM:    District Court of the First Judicial District,
                     In and For the County of Lewis and Clark, Cause No. XBDV-2018-1429
                     Honorable Luke Berger, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Stefan T. Wall, Denny K. Palmer, Wall, McLean & Gallagher, PLLC,
                Helena, Montana

        For Appellees:

                Christian T. Nygren, Hannah C. Woolsey, Montana Department of
                Transportation, Helena, Montana

                Curt Drake, Drake Law Firm PC, Helena, Montana

Submitted on Briefs:  June 22, 2022

Decided:  October 4, 2022

Filed:

_____
Clerk

2

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Hamlin Construction and Development Company, Inc., and owners Jerry and Barbara Hamlin individually and on behalf of their family trust (collectively, "Hamlin"), appeal several orders from the First Judicial District Court in Lewis and Clark County. Hamlin is developing a subdivision on property containing a floodplain within Lewis and Clark County (County), and the County required Hamlin to accommodate a certain 100-year flood discharge volume to receive a floodplain development permit. Doing so will require Hamlin to construct a detention pond where it had hoped to put houses. In 2009, the Montana Department of Transportation (MDT) reconstructed a public road, an arterial running adjacent to Hamlin's proposed subdivision. In the process, MDT upgraded the existing culverts under the road to have a greater capacity to drain water from the property, which had experienced flooding in the recent past. Hamlin argues that MDT should have upgraded the culverts to an even greater flow capacity, which Hamlin contends would have led to a more favorable County permitting decision and thereby maximized the profitability of the proposed development.

¶2 Hamlin appeals several unfavorable District Court orders, raising issues that we restate as follows:

> *Issue One: Did the District Court err in dismissing Hamlin's inverse condemnation claim?*
>
> *Issue Two: Did the District Court err in dismissing Hamlin's unjust enrichment claim?*
>
> *Issue Three: Did the District Court err in finding § 76-5-109(4), MCA, constitutional?*

3

*Issue Four: Did the District Court err in dismissing Hamlin's remaining nuisance claims?*

*Issue Five: Did the District Court abuse its discretion in declining to consolidate Hamlin's two lawsuits?*

¶3     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     Hamlin's property sits at the intersection of Lake Helena Drive and Canyon Ferry Road in Lewis and Clark County. Hamlin's planned development (the Subdivision) has been in the works since Hamlin purchased the property in 2006. Hamlin and the County litigated plat approval for the subdivision for several years, settling that matter in 2014. However, because Hamlin's proposed development sits on a 100-year floodplain, final plat approval depends upon Hamlin satisfying the criteria to receive a floodplain development permit.

¶5     Hamlin submitted three floodplain permit applications, and the County approved the third in 2018. It had rejected the first two applications based on a finding that the projected 100-year flood flow rates that Hamlin had used—501.8 cubic feet per second (cfs) and 548 cfs, respectively—were "unreasonably low" and would increase the risk of flooding in the proposed subdivision. Hamlin's 2018 permit application projected a 100-year flood flow rate of 1300 cfs, following the County's recommendation. However, Hamlin asserts that accommodating this projected flood volume would require Hamlin to construct a large detention pond that would cut into developable acreage.

4

¶6 Years before Hamlin's 2006 purchase of the property, MDT had begun planning reconstruction of Canyon Ferry Road,[1] which leads to and runs past Hamlin's proposed subdivision, in order to address safety concerns associated with the existing roadway. During MDT's environmental analysis, Robert and Colleen Garber, who then owned the property at issue, submitted a comment in 2003 noting the extent and depth of recent floodwater on the property, "with flooding over Canyon Ferry Rd.[] in spite of large culverts." The Garbers suggested that MDT consider incorporating something like a "flood carrying structure" over a canal adjacent to Lake Helena Drive. MDT responded to the Garber's comment and noted that it would continue to coordinate the flood control aspects of its project with the County and other agencies. MDT observed that where the area's drainage basin crosses Canyon Ferry Road, the "level terrain compounds the difficulty in providing corrective measures."

¶7 Later, in 2006, MDT and the Garbers were negotiating a right-of-way related to the reconstruction project, and the Garbers again described their flooding concerns, suggesting that MDT install four six-foot diameter culverts, instead of the four 73-inch by 45-inch (roughly equivalent to five-foot diameter) culverts it was planning to use. The Garbers again noted the depth and extent of recent floodwaters on their property and where water had overtopped Canyon Ferry Road. In response, MDT explained that the preexisting

---

[1] Section 60-1-201(1), MCA, provides for the classification of highways and roads as either "(a) commission-designated highway systems; (b) state highways; (c) county roads; [or] (d) city streets." County roads include "those that are opened, established, constructed, maintained, changed, abandoned, or discontinued by a county in accordance with Title 7, chapter 14." Section 60-1-201(3), MCA.

culverts were of "substantially lesser dimensions" and that its proposed new culverts would have "approximately 3 times more capacity than the existing pipes" at high water and would "exceed the 50-year, 100-year and near capacity to handle the 200-year flow." MDT noted that while the new culverts resulted in a roadway raised enough to allow emergency vehicles to pass during most flooding events, installing even bigger culverts as requested by the Garbers would require raising the road surface even further, which could exacerbate the problem.

¶8 Prior to engaging in its reconstruction project, MDT also needed to receive a floodplain development permit from the County, which was granted in 2008. The permit required MDT to construct culverts under the road that would accommodate a water flow rate of about 512 cfs. MDT carried out the reconstruction starting in 2009.

¶9 Hamlin sued MDT in 2018, seeking compensation from the agency for its alleged role in causing Hamlin to be required to accommodate the floodplain development permit requirements. Hamlin raised multiple legal claims against MDT, including public and private nuisance, inverse condemnation, negligence, and negligent misrepresentation. Hamlin later added a claim for unjust enrichment in its amended complaint. Hamlin also sued the County in a separate case, raising similar claims. Hamlin later filed a motion in the District Court seeking to consolidate the two cases.

¶10 On August 28, 2019, the District Court issued an order granting, in part, MDT's motion to dismiss Hamlin's claims. The District Court dismissed the negligence and negligent misrepresentation claims pursuant to § 76-5-109(4), MCA, which grants immunity to the State when suits for damages arise out of floodplain obstructions that were

6

constructed pursuant to valid permits issued under specified code provisions. However, the District Court declined to dismiss Hamlin's nuisance claims to the extent they sought nonmonetary relief and likewise declined to dismiss Hamlin's constitutional inverse condemnation claim. The District Court subsequently issued an order denying Hamlin's separate motion for declaratory judgment that § 76-5-109(4), MCA, was unconstitutional as applied to preclude Hamlin's negligence and negligent misrepresentation claims.

¶11    On May 5, 2020, the District Court issued an order denying Hamlin's motion to consolidate the present case with Hamlin's parallel case against the County. On June 24, 2020, the District Court issued an order granting MDT's motion to dismiss the unjust enrichment claim. On March 29, 2021, the District Court denied yet another motion to consolidate. Finally, on June 29, 2021, the District Court issued an order granting summary judgment to MDT and dismissing Hamlin's remaining claims for inverse condemnation and nuisance. Hamlin appeals to this Court.

## STANDARD OF REVIEW

¶12    We review summary judgment rulings de novo. *Thornton v. Flathead Cty.*, 2009 MT 367, ¶ 13, 353 Mont. 252, 220 P.3d 395 (citation omitted). We also review de novo a district court's ruling on a motion to dismiss under M. R. Civ. P. 12(b)(6), evaluating the court's legal conclusions regarding a complaint's failure to state a claim for correctness. *Cowan v. Cowan*, 2004 MT 97, ¶ 10, 321 Mont. 13, 89 P.3d 6 (citation omitted). We exercise plenary review of constitutional issues. *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 12, 382 Mont. 256, 368 P.3d 1131 (citations omitted) (*Mont. Cannabis Indus. Ass'n II*). We review a district court's decision on a motion to consolidate for abuse

of discretion. *In re Estate of McDermott*, 2002 MT 164, ¶ 14, 310 Mont. 435, 51 P.3d 486 (citation omitted).

**DISCUSSION**

¶13 Hamlin appeals a number of District Court orders dismissing Hamlin's claims against MDT. The essence of Hamlin's argument is that MDT owes Hamlin compensation for having failed to install larger culverts during the 2009 Canyon Ferry Road reconstruction project, which Hamlin alleges would have led to a more favorable County floodplain permitting decision for Hamlin's Subdivision and would not have necessitated the construction of a large detention pond in order to proceed with development.

¶14 *Issue One: Did the District Court err in dismissing Hamlin's inverse condemnation claim?*

¶15 Hamlin challenges the District Court's grant of MDT's motion for summary judgment dismissing Hamlin's claim for inverse condemnation or taking. As below, Hamlin argues that MDT, by failing to install larger culverts during its work on Canyon Ferry Road, caused the County to condition permitting of Hamlin's proposed development project on the construction of a large stormwater detention pond. Hamlin asserts that MDT thereby conducted a constitutional taking or damaging of Hamlin's property, entitling Hamlin to just compensation.

¶16 "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Wittman v. City of Billings*, 2022 MT 129, ¶ 5, 409 Mont. 111, 512 P.3d 1209 (citations and internal quotations omitted); *Borges v. Missoula Cty. Sheriff's Office*, 2018 MT 14, ¶ 16, 390 Mont.

8

161, 415 P.3d 976. Evidence is viewed, and reasonable inferences are drawn, in the light most favorable to the non-moving party. *Brishka v. State*, 2021 MT 129, ¶ 9, 404 Mont. 228, 487 P.3d 771 (citation omitted). The initial burden lies with the movant and, upon being met, shifts to the non-moving party to demonstrate a genuine issue of material fact. *Brishka*, ¶ 9 (citation omitted); *Thelen v. Billings*, 238 Mont. 82, 85-86, 776 P.2d 520, 522 (1989). A party opposing a motion for summary judgment must present facts of a substantial nature; speculative or conclusory statements are insufficient to raise a genuine issue of material fact. *Brishka*, ¶ 9; *Thelen*, 238 Mont. at 86, 776 P.2d at 522.

¶17 Article II, Section 29, of the Montana Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner." *See also* U.S. Const. amend. V (private property shall not "be taken for public use[] without just compensation"). A "taking" of property describes a government's exercise of its power of eminent domain—the power of the sovereign to take property for public use without the owner's consent. *Wittman*, ¶ 14 (citation omitted). The remedy of a property owner challenging such an action may be "just compensation." *Wittman*, ¶ 14 (citing *Cottonwood Envtl. Law Ctr. v. Knudsen*, 2022 MT 49, ¶ 20, 408 Mont. 57, 505 P.3d 837; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030, 112 S. Ct. 2886, 2901 (1992)). A "condemnation" occurs when the government first initiates proceedings to take property and compensate the owner, while an "inverse condemnation" refers to a legal action brought by a property owner *after* the government has taken actions impinging upon the plaintiff's property interests, even without a formal exercise of the power of eminent

9

domain. *Wittman*, ¶ 14 (citations omitted); *Adams v. Dep't of Highways*, 230 Mont. 393, 397, 753 P.2d 846, 848 (1988) (citations omitted); *Kirby Forest Ind., Inc. v. United States*, 467 U.S. 1, 5 n.6 104 S. Ct. 2187, 2191 (1984). Thus, a plaintiff's success on an inverse condemnation claim depends upon whether the plaintiff can show that the challenged government action amounts to a taking or damaging in the constitutional sense.

¶18    The preliminary question in a takings claim is whether the subject of the alleged taking constitutes a cognizable property interest, as defined by independent sources of state law and characterized by rights such as those of exclusion, use, transfer, or disposition. *Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 2008 MT 460, ¶¶ 32-33, 348 Mont. 80, 201 P.3d 8 (citing *Mohlen v. United States*, 74 Fed. Cl. 656, 660 (Fed. Cl. 2006); *Seven Up Pete Venture v. State*, 2005 MT 146, ¶ 26, 327 Mont. 306, 114 P.3d 1009; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S. Ct. 2862, 2872 (1984)); *Malpeli v. State*, 2012 MT 181, ¶ 15, 366 Mont. 69, 285 P.3d 509 (citing *Kafka*, ¶ 33). Further, to be compensable in an inverse condemnation claim for damage to property, the alleged damage must not be common to the public at large nor constitute a mere *de minimus* temporary infringement upon the enjoyment of property, particularly if not reflected in property value. *Wittman*, ¶ 25. *See Knight v. Missoula*, 252 Mont. 232, 241-42, 827 P.2d 1270, 1276 (1992) (citations omitted); *Less v. Butte*, 28 Mont. 27, 33, 72 P. 140, 141-42 (1903); *Root v. Butte, A. & P. Ry.*, 20 Mont. 354, 358, 51 P. 155, 156 (1897). Finally, the alleged damage must have been foreseeably caused by the public project at issue. *See Wittman*, ¶ 25 (inverse condemnation claim requires a plaintiff to demonstrate "a public project was deliberately planned and built in such a way that the taking or damaging of private property was

10

foreseeable, and, as planned and built, the project damaged the plaintiff's property"); *State v. Deschner* 2017 MT 37, ¶ 22, 386 Mont. 342, 390 P.3d 152; *Knight*, 252 Mont. at 243, 827 P.2d at 1276; *Rauser v. Toston Irrigation Dist.*, 172 Mont. 530, 538, 565 P.2d 632, 637 (1977).

¶19 The causation analysis for an inverse condemnation claim encompasses two facets: cause-in-fact and foreseeability. *See Wittman*, ¶ 25 (requiring a plaintiff to demonstrate both foreseeability— "public project was deliberately planned and built in such a way that the taking or damaging of private property was foreseeable"—and cause-in-fact—"the project damaged the plaintiff's property").[2] *See also*, *Deschner*, ¶ 22 ("The elements a plaintiff must prove in an inverse condemnation claim are (1) that the public improvement was deliberately planned and built; and (2) that, as planned and built, the public improvement proximately caused damage to the plaintiff's property."); *Rauser*, 172 Mont. at 538, 565 P.2d at 637 ("It is enough to show the damages were proximately caused by the undertaking of the project and a reasonabl[y] foreseeable consequence of the undertaking."); *Knight*, 252 Mont. at 243, 827 P.2d at 1276. Under the cause-in-fact element, a plaintiff must show that the alleged damage is attributable to the challenged government action. Typically, cause-in-fact is analyzed under the "but-for" test, under which cause-in-fact will be found to exist when, "but for" the challenged public project,

---

[2] Hamlin argues that the District Court erred in finding foreseeability of harm to be an essential element of an inverse condemnation claim. Our recent *Wittman* decision, handed down after Hamlin's opening brief was filed, definitively resolved this issue. *See Wittman*, ¶ 25 (providing that foreseeability of harm is a necessary element of an inverse condemnation claim).

11

the property would not have suffered the damage at hand. *See Busta v. Columbus Hosp*, 276 Mont. 342, 371, 916 P.2d 122, 139 (1996) ("[A] party's conduct is a cause-in-fact of an event if 'the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.'" (quoting W. Page Keeton, et al., *Prosser and Keeton on Torts* § 41, 266 (5th ed. 1984)); *Kiger v. State*, 245 Mont. 457, 460, 802 P.2d 1248, 1250 (1990) ("The 'but for' rule serves to explain the great majority of cases" with regard to cause-in-fact). In other words, the challenged act must be a necessary precondition for the damage for which compensation is sought.

¶20    In contrast to pure causation-in-fact, the foreseeability tier cuts off legal liability resulting from the "logical extreme" of traceable chains of causation stretching into infinity, particularly when unforeseen independent causes intervene to divert the causal chain in unpredictable ways or public policy considerations compel a truncation of liability. *See Thelen*, 238 Mont. at 87, 776 P.2d at 523; *Kiger*, 245 Mont. at 460, 802 P.2d at 1250 ("Theoretically consequence for one's acts could continue into eternity but at some point in the chain of causation the law must intervene and absolve the defendant of liability."); *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40 (quotation and citations omitted); *Wittman*, ¶ 57 (Sandefur, J., dissenting) (citations omitted); *Rauser*, 172 Mont. at 538-39, 565 P.2d at 637-38 (citation omitted).

¶21    We can resolve the present dispute with reference to the question of cause-in-fact, i.e., whether MDT's project damaged Hamlin's property. *See Wittman*, ¶ 25 (holding that one of the necessary elements of an inverse condemnation claim is that "the project

12

damaged the plaintiff's property"). The damage Hamlin alleges is in the form of Hamlin's inability to obtain a County floodplain development permit to construct the Subdivision without the construction of a large floodwater detention pond.[3] Relying on a hydrology engineer's affidavit, Hamlin asserts that, but for MDT's decision to install the four culverts that it did, rather than even larger culverts, Hamlin would not be required to build a large detention pond in order to permit the proposed development.[4] This, however, does not raise a dispute of fact that is material to the elements of an inverse condemnation claim. An inverse condemnation claim requires that a "public project" damaging private property be actually "planned and built" and is predicated on what the government actually did, rather than what it *might have* done. *See Wittman*, ¶ 25 (plaintiff in an inverse condemnation suit must show, inter alia, that "as planned and built, the project damaged the plaintiff's property").

¶22 In Hamlin's case, the relevant question is whether the actual, "planned and built" public project at issue caused the alleged damage for which Hamlin seeks compensation. The public project that Hamlin challenges here is MDT's reconstruction of Canyon Ferry

---

[3] We leave aside the preliminary question of whether Hamlin has a legally cognizable property interest to develop property within a designated floodplain without first constructing a large floodwater detention pond. *See Kafka*, ¶ 52 (license to operate game farm on property not a compensable property interest; "when a citizen voluntarily enters into a market subject to pervasive government control, he cannot be said to possess the right to exclude" (quoting *Members of the Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1331 (Fed. Cir. 2005))); §§ 76-5-102, -202, -301, -302, MCA (providing notice requirements for designation of a floodplain and authorizing land use restrictions on property containing a designated floodplain).

[4] The engineer stated that the "required construction of the detention pond . . . would not have . . . been necessary had MDT instead designed its culverts under Canyon Ferry Road to accommodate its alternative and much higher calculation of 1,532 cfs."

13

Road, commencing in 2009,[5] while the alleged damage is the necessity of building a large detention pond in order to develop. The record is devoid of any evidence that the former caused the latter. Hamlin does not assert that MDT's 2009 project created or worsened flood concerns on the property. To the contrary, the record establishes that the property *already* experienced significant flooding and that MDT's project, far from worsening these preexisting flooding issues, significantly *ameliorated* them by replacing the existing culverts on Canyon Ferry Road with much bigger, more effective new culverts with which to better drain floodwater from the property. On multiple occasions prior to the commencement of MDT's reconstruction project, the previous owners of the property had described significant recent flooding on their property. MDT responded that the preexisting culverts were of substantially lesser dimensions than those MDT would install, which would have "approximately 3 times more capacity than the existing pipes." Hamlin does not dispute these material facts. Thus, but for[6] MDT's road improvements, the

---

[5] Notably, Hamlin is not challenging the existence of Canyon Ferry Road itself, or any other construction or maintenance prior to 2009.

[6] While Hamlin argues that the County's permitting decision should not serve to cut off MDT's liability for Hamlin's development plans on the basis of foreseeability, Hamlin does not argue that this is an instance in which the "substantial factor" test should replace the usual "but for" test for cause-in-fact. In unusual cases where two independent causes—each sufficient, alone to have brought about the plaintiff's damages—converge (the classic example being a fire with two independent fire starts), the "substantial factor" test is used instead due to the "but for" test's inability to find *either* act to be a necessary cause of the damage. *Kiger*, 245 Mont. at 460, 802 P.2d at 1250 (citing *Kitchen Krafters v. Eastside Bank*, 242 Mont. 155, 789 P.2d 567 (1990)). *See Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 60, 316 Mont. 469, 74 P.3d 1021, (Nelson, J., dissenting) (explaining substantial factor test (citing W. Page Keeton et al., *Prosser and Keeton on Torts*, § 41 268 (5th ed. 1984))); *Busta*, 276 Mont. at 371, 916 P.2d at 139 (clarifying causation in Montana tort law but retaining substantial factor test laid out in *Rudeck v. Wright*, 218 Mont. 41, 709 P.2d 621 (1985) and *Kyriss v. State* 218 Mont. 162, 707 P.2d 5 (1985) when typical cause-in-fact instruction with regard to multiple causes is "confusing and

undisputed facts demonstrate that Hamlin's property *would still continue to suffer* from the poor drainage and heightened flood risks it had previously faced and Hamlin *would still have suffered* an unfavorable—perhaps far more so—County permitting decision. Hamlin therefore cannot establish the necessary cause-in-fact to meet the requirement that MDT's "project damaged [Hamlin's] property." *Wittman*, ¶ 25.

¶23    In a legal sleight of hand, Hamlin attempts to invert takings jurisprudence by asserting that an inability to acquire *benefits* Hamlin might otherwise have received pursuant to actions the government *might have, but did not,* take equates to suffering *damage* due to a public project. Hamlin, however, does not have a compensable property interest in acquiring tax-payer funded *improvements* to private property. Takings jurisprudence is concerned with ensuring that the *costs* incidental to public improvements benefitting society at large are not unfairly concentrated onto the backs of an unlucky few. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123-24, 98 S. Ct. 2646, 2659 (1978) (Fifth Amendment takings clause bars government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960)

---

misleading"). Here, Hamlin does not argue that both MDT's actions and the County's floodwater management metrics were *each independently sufficient* to cause the alleged harm. Rather, Hamlin asserts that, while neither MDT's nor the County's decisions were sufficient alone, both were necessary preconditions to the eventual detention pond requirement Hamlin challenges. Thus, the but-for test is the proper test of causation-in-fact. *See Kiger*, 245 Mont. at 460, 802 P.2d at 1250 (citation omitted).

(internal quotation marks omitted)). In contrast, Hamlin's formulation seeks to maximize the *benefits* incidental to a public work that might fall on a lucky few.[7]

¶24 Neither does Hamlin point to any authority or reasoning that could suggest that simply because a government entity has undertaken some measures that might incidentally benefit private property, it is now obligated to continue on to *maximize* those incidental benefits. Hamlin cites to a California case, *City of Oroville v. Superior Court*, for the proposition that "[w]here the undertaking of the project at the lower cost creates some risk, however slight, of damage to plaintiffs' property, it is proper to require the public entity to bear the loss when damage does occur." 446 P.3d 304, 313 (Cal. 2019) (citation and internal quotation marks omitted). Here, however, Hamlin does not assert that MDT *created a new* flooding hazard with its 2009 project and then cut costs with less-than-optimal culvert size when it came to mitigation of that risk. Rather, as noted

---

[7] Clearly, there are a functionally infinite number of actions any government agency *could* affirmatively take at any time that might be helpful to various private parties. For example, it is conceivable that the government could create a large attraction, such as a park, near Canyon Ferry Road, thereby increasing tourism traffic and increasing the commercial profitability of properties in the area. Every moment that the government fails to take this course of action, property owners in the area are deprived of the property value increases that they might otherwise attain if the government would only proceed with such an undertaking. Clearly, the government is not taking or damaging properties in a constitutional sense with each passing second of inaction.

In economic terms, Hamlin confuses the minimization of negative externalities with the maximization of positive externalities. *Compare* Black's Law Dictionary 729 (Bryan A. Garner 11th ed. 2019) (defining "negative externality" as: "An externality that is detrimental to another, such as water pollution created by a nearby factory.") *with* Black's Law Dictionary 729 (Bryan A. Garner 11th ed. 2019) (defining "positive externality" as: "An externality that benefits another, such as the advantage received by a neighborhood when a homeowner attractively landscapes the property.") *and* Black's Law Dictionary 729 (Bryan A. Garner 11th ed. 2019) (defining "externality" as: "A consequence or side effect of one's economic activity, causing another to benefit without paying or to suffer without compensation.")

above, the record demonstrates that the flooding hazard predated the project at issue and MDT's project, if anything, reduced these preexisting concerns.[8]

¶25　Far from suffering damage to the subject property, Hamlin received a windfall and now laments that it was not greater. Hamlin's argument essentially boils down to an observation that, so long as MDT was engaging in taxpayer-funded amelioration of preexisting flooding concerns on a private property Hamlin was eyeing for development, it would have been quite convenient for Hamlin if MDT had further subsidized the enterprise by going on to *completely* abate the flood hazard and thereby maximize Hamlin's profit potential. This argument does not equate to a successful claim of a taking or damaging of property in a constitutional sense.

¶26　At summary judgment, MDT made supported argument that Hamlin "cannot establish the necessary element of causation," asserting that the "fatal flaw" in Hamlin's claim was that "MDT was not the but-for cause or the moving force behind the alleged constitutional taking." The burden was then on Hamlin to point to evidence sufficient to raise a genuine issue of material fact on the necessary element of cause-in-fact. *See Brishka*, ¶ 9; *Thelen*, 238 Mont. at 85-86, 776 P.2d at 522 (defendant-movants for summary judgment, though required to show entitlement to judgment as a matter of law, are not required to "prove the reverse of Plaintiffs' case" to satisfy the initial burden of proof at summary judgment). Hamlin failed to point to any evidence that would raise a

---

[8] MDT had responded to the Garbers' comments requesting that MDT install even larger culverts during the reconstruction by noting that installing the suggested six-foot diameter culverts would require raising the height of Canyon Ferry Road, potentially increasing flood concerns on the property during a large water event.

fact issue regarding whether, but for MDT's decision to improve the existing culverts along Canyon Ferry Road, Hamlin would not have been required to construct the large stormwater detention pond in order to obtain a floodplain development permit. Rather, the record evidence convincingly demonstrates that Hamlin's proposed development would have faced equally harsh, if not far more so, development restrictions absent MDT's improvements. Because Hamlin failed to come forward with sufficient proof to raise an issue of material fact regarding an essential element of an inverse condemnation claim, the grant of MDT's motion for summary judgment on this claim was proper.

¶27 Hamlin chose to locate a subdivision on property containing a 100-year floodplain. The floodplain was in existence irrespective of the improvements MDT made to Canyon Ferry Road. Arguably, the improvements aided the potential for a subdivision, but by no means were they the cause of the conditions present in Hamlin's eventual subdivision approval.

¶28 *Issue Two: Did the District Court err in dismissing Hamlin's unjust enrichment claim?*

¶29 Hamlin appeals the District Court's June 24, 2020 grant of MDT's motion to dismiss Hamlin's claim for unjust enrichment pursuant to M. R. Civ. P. 12(b)(6). Under Rule 12(b)(6) a court must take all well-pled, "non-conclusory" factual assertions as true and view them in the light most favorable to the claimant, drawing all reasonable inferences in favor of the claim. *Meyer v. Jacobsen*, 2022 MT 93, ¶ 4, 408 Mont. 369, 510 P.3d 52 (citations omitted); *Anderson v. ReconTrust Co., N.A.*, 2017 MT 313, ¶ 8, 390 Mont. 12, 407 P.3d 692 (citation omitted); *Kleinhesselink v. Chevron, U.S.A.*, 277 Mont. 158, 161,

18

920 P.2d 108, 110 (1996) (citation omitted). A claim may be dismissed pursuant to M. R. Civ. P. 12(b)(6) if it fails to state a cognizable legal theory for relief or states an otherwise valid legal claim but fails to state sufficient facts that, if true, would entitle the claimant to relief under that claim. *Babcock v. Casey's Mgmt., LLC*, 2021 MT 215, ¶ 25, 405 Mont. 237; 494 P.3d 322 (citing *Anderson*, ¶ 8). The liberal notice pleading requirements of M. R. Civ. P. 8(a) and 12(b)(6) do "not go so far to excuse omission of that which is material and necessary in order to entitle relief," and the "complaint must state something more than facts which, at most, would breed only a suspicion" that the claimant may be entitled to relief. *Anderson*, ¶ 8; *Jones v. Montana Univ. Sys.*, 2007 MT 82, ¶ 42, 337 Mont. 1, 155 P.3d 1247.

¶30 A successful unjust enrichment claim requires: (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit. *Associated Mgmt. Servs. v. Ruff*, 2018 MT 182, ¶ 65, 392 Mont. 139, 424 P.3d 571 (citing *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Great Falls/Billings Dioceses*, 2013 MT 24, ¶¶ 36, 39, 368 Mont. 330, 296 P.3d 450). On March 12, 2020, Hamlin filed a First Amended Complaint adding a new claim for unjust enrichment. The First Amended Complaint asserted that MDT was unjustly enriched by obtaining a "benefit" in the form of the requirement that Hamlin construct an "enormous detention pond," accommodating for the "defects and deficiencies" in MDT's "grossly undersized" culverts and thereby relieving MDT of its "enormously expensive duty to install a bridge

or install additional and substantially larger culverts" and "significantly raise the highway grade" pursuant to its "costly statutory maintenance duties . . . to repair, correct or eliminate the defects and deficiencies that were found to exist in those culverts." The District Court found that Hamlin had not alleged facts sufficient to show that the culverts were defective or deficient, absent Hamlin's plans to build the Subdivision, and thus failed to show that MDT had a duty to repair, correct, or eliminate deficiencies or defects.

¶31 Hamlin first challenges the District Court's finding that Hamlin had not alleged sufficient facts to show that the culverts were defective or deficient for reasons beyond Hamlin's plans to develop the flood-plain property at issue. Hamlin points to the assertion in Hamlin's First Amended Complaint[9] that "[t]he hazardous condition created by MDT's installation of undersized culverts constitutes a defect and deficiency in public infrastructure for which Hamlins have no responsibility, nor is it the result of any expected impacts of their Subdivision." Hamlin argues on appeal that this statement sufficiently alleged a true "deficiency" in MDT's culverts that was not merely a result of Hamlin's proposed development plans and that the District Court failed to construe these allegations as true for purposes of Rule 12(b)(6). However, such bare conclusory assertions are of the type that "at most, would breed only a suspicion" that Hamlin is entitled to relief. *See Anderson*, ¶ 8; *Meyer*, ¶ 4; *Jones*, ¶ 42. While Hamlin's complaint may have attempted to slap the conclusory label of "defect and deficiency in public infrastructure" onto MDT's

---

[9] This assertion was made in the section of the complaint alleging inverse condemnation and Hamlin did not incorporate this allegation by reference into the portion of the complaint dedicated to unjust enrichment.

20

culverts, that is not the same as alleging actual *facts* that, if true, would demonstrate that MDT was somehow enriched by the 2009 installation of culverts in a public road improvement project.[10]

¶32 Hamlin also takes issue with the subsequent sentence in the District Court's order: "Hamlins were the ones who decided to build the Subdivision on their land in a floodplain, *necessitating a higher flowrate accommodation*, and must therefore shoulder the costs of development." (Emphasis added.) Hamlin argues that nothing about Hamlin's building plans should have necessitated a higher flow-rate accommodation. Regardless of whether, for purposes of a ruling on a Rule 12(b)(6) motion, the well-pled facts established what had "necessitat[ed]" the County's eventual flow-rate accommodation requirements for Hamlin's proposed Subdivision, it is clear in context that the District Court was merely stating that Hamlin had failed to allege facts showing that a "benefit" had been conferred upon MDT because Hamlin had alleged no facts that would demonstrate that there was anything wrong with MDT's culverts that might trigger a duty to repair. The District Court did not err in finding that Hamlin had alleged no facts demonstrating that there were any problems associated with MDT's new culverts beyond those associated with Hamlin's plans to develop the Subdivision.

¶33 Hamlin also argues that the District Court "ignored" Hamlin's well-pled factual assertion that MDT had a statutory duty to "correct . . . the errors and deficiencies" alleged to exist in its new culverts. The District Court plainly found, however, that, because

---

[10] If anything, the public had the benefit of an improved road (as did Hamlin), but MDT was not a beneficiary.

21

Hamlin had not alleged sufficient facts to demonstrate that the culverts were "defective or deficient," Hamlin's alleged facts were likewise insufficient to show that "MDT had a duty to repair, correct or eliminate deficiencies or defects." Moreover, while Hamlin cites to various authorities on appeal in support of the assertion that MDT has a duty to maintain and/or repair its culverts, Hamlin alleges no facts that, if true, would demonstrate that MDT would have actually been forced to replace these newly-installed culverts absent Hamlin's detention pond.[11] Hamlin's conclusory and unsupported allegation in pleadings that, without the conditioning of Hamlin's proposed development upon the construction of a stormwater detention pond, MDT would have been forced to undertake the "enormously expensive" project of "install[ing] a bridge or install[ing] additional and substantially larger culverts" does not support a claim of unjust enrichment. *See Meyer*, ¶ 4; *Anderson*, ¶ 8; *Jones*, ¶ 42. Because Hamlin failed to allege facts sufficient to demonstrate an element—conferral of a benefit—necessary to establish a claim for unjust enrichment entitling Hamlin to relief, the District Court did not err in granting MDT's motion to dismiss Hamlin's claim under M. R. Civ. P. 12(b)(6).

¶34 *Issue Three: Did the District Court err in finding § 76-5-109(4), MCA, constitutional?*

¶35 Hamlin appeals the District Court's dismissal of Hamlin's claims for negligence and negligent misrepresentation to the extent that they sought money damages on the basis of

---

[11] Hamlin's First Amended Complaint alleged that MDT's floodplain permit application to install its culverts was reviewed and approved by the Department of Natural Resources and Conservation and the County and that MDT installed its culverts pursuant to the permit.

statutory sovereign immunity. The District Court relied upon § 76-5-109(4), MCA, which provides that "[a]n action for damages sustained because of injury caused by an obstruction for which a permit has been granted under parts 1 through 4 [of Title 76, chapter 5, MCA, titled "Flood Plain and Floodway Management"] may not be brought against the state or the department."[12] The District Court subsequently denied Hamlin's separate Motion for Declaratory Judgment, rejecting Hamlin's assertion that § 76-5-109(4), MCA, as interpreted to bar damages recovery for Hamlin's negligence claims against MDT, was unconstitutional. Hamlin appeals this constitutional ruling, arguing that § 76-5-109(4), MCA, violates the substantive due process rights found in Article II, Section 17, of the Montana Constitution and Amendments V and XIV of the United States Constitution.

¶36 In order to determine if a constitutional right has been lost, a court must first determine which of the established levels of scrutiny is appropriately applied: strict scrutiny, middle-tier scrutiny, or the rational basis test. *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 17, 325 Mont. 148, 104 P.3d 445; *Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 1999 MT 248, ¶¶ 54-58, 296 Mont. 207, 988 P.2d 1236. Legislation that interferes with a fundamental constitutional right is evaluated under a strict-scrutiny standard, whereby the government must show that the law is narrowly tailored to serve a compelling government interest. *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 16, 366 Mont. 224, 286 P.3d 1161 (*Mont. Cannabis Indus. Ass'n I*) (citing *Snetsinger*, ¶ 17). If a law or

---

[12] The District Court ruled that the culverts constituted an "obstruction" under the statute and that, since MDT had received a permit for its project, MDT, as an entity of the of the State, was immune from a damages suit other than for inverse condemnation.

policy affects a right conferred by the Montana Constitution, but is not found in the Constitution's declaration of rights, we apply middle-tier scrutiny. *Mont. Cannabis Indus. Ass'n I*, ¶ 16, *Snetsinger*, ¶ 18. If neither strict scrutiny nor middle-tier scrutiny apply, the rational basis test is appropriate. *Mont. Cannabis Indus. Ass'n II*, ¶ 21; *Mont. Cannabis Indus. Ass'n I*, ¶ 16. Pursuant to the rational basis test, the statute must be rationally related to a legitimate government interest. *Mont. Cannabis Indus. Ass'n I*, ¶ 16, *Snetsinger*, ¶ 19.

¶37 Hamlin points to Article II, Section 3, of the Montana Constitution as demonstrating that a fundamental right requiring the application of strict scrutiny is implicated by § 76-5-109(4), MCA. Article II, Section 3, titled "Inalienable rights," provides that:

> [a]ll persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, *acquiring, possessing and protecting property*, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities.

(Emphasis added.)

¶38 However, not every law that results in some incidental restriction or effect upon the use of private property implicates property rights to a constitutional magnitude. *See Park Cty. Envtl. Council v. Mont. Dep't of Envtl. Quality*, 2020 MT 303, ¶¶ 79-82, 402 Mont. 168, 201, 477 P.3d 288 (enforcement of Montana Environmental Policy Act did not implicate mining company's "private property rights to a constitutionally cognizable degree"); *Williams v. Bd. of Cty. Comm'rs of Missoula Cty.*, 2013 MT 243, ¶ 56, 371 Mont. 356, 308 P.3d 88 (regulations "designed to have a real and substantial bearing upon the public health, safety, morals and general welfare of a community" typically do not "unduly

24

interfere with the fundamental nature of private property ownership" (internal quotations omitted)). To the extent that § 76-5-109(4), MCA, bars Hamlin's claims for a damages remedy for obstructions permitted in accordance with Title 76, chapter 5, MCA, but does not bar just compensation for a constitutional taking or damaging pursuant to Article II, Section 29, of the Montana Constitution or Amendment V of the United States Constitution, the challenged statutory section does not impinge upon Hamlin's rights of "acquiring, possessing and protecting property" to a degree sufficient to review the statute under strict scrutiny.

¶39 Where a fundamental right is not implicated, "[s]ubstantive due process analysis requires a test of the reasonableness of a statute in relation to the State's power to enact legislation." *Mont. Cannabis Indus. Ass'n II*, ¶ 21 (citation and internal quotation marks omitted); *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 33, 353 Mont. 265, 222 P.3d 566. Under this "rational basis" standard, we analyze substantive due process claims by examining (1) whether the legislation in question is supported by a legitimate governmental concern, and (2) whether the means chosen by the Legislature to accomplish its objective are reasonably related to the result sought to be attained. *Mont. Cannabis Indus. Ass'n II*, ¶ 21 ("Since the State cannot use its power to take an unreasonable, arbitrary or capricious action against an individual, a statute enacted by the legislature must be reasonably related to a permissible legislative objective in order to satisfy guarantees of substantive due process." (citation and internal quotation marks omitted)); *Walters v. Flathead Concrete Prods.*, 2011 MT 45, ¶ 18, 359 Mont. 346, 249 P.3d 913; *Satterlee*, ¶ 33 (citation omitted). The legislation's purpose "does not have to appear on the face of the

25

legislation or in the legislative history, but may be any possible purpose of which the court can conceive." *Mont. Cannabis Indus. Ass'n II*, ¶ 22 (citing *Walters*, ¶ 28) (internal quotation marks omitted); *Kottel v. State*, 2002 MT 278, ¶ 55, 312 Mont. 387, 60 P.3d 403.

¶40 Hamlin argues that even under rational basis review, § 76-5-109(4), MCA, should be found unconstitutional as not rationally related to a legitimate government interest. Under rational basis review, the law's challenger must bear the burden of overcoming the presumption that the enactment is constitutional and proving its unconstitutionality beyond a reasonable doubt. *Powell v. State Comp. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877 (citations omitted); *Davis v. Union Pac. R.R.*, 282 Mont. 233, 240, 937 P.2d 27, 31 (1997). The District Court interpreted § 76-5-109(4), MCA, as immunizing government agencies from damages liability caused by *their own* properly permitted installations, rather than merely immunizing the government from liability for *permitting another party's actions* that are alleged to have caused damage. Hamlin did not argue for a different interpretation either below or on appeal. However, Hamlin does argue that it "makes no logical sense," and there is no rational basis for § 76-5-109(4), MCA, to afford immunity to *all* State entities, including MDT, rather than only those that are tasked with floodplain designation and land use *decisionmaking* responsibilities under Title 76, chapter 5, MCA. It is conceivable that a purpose of § 76-5-109(4), MCA, is to encourage government entities such as MDT to develop beneficial public works, but to do so in a manner that does not cause unnecessary harm to the public or to private property. Shielding such entities from the threat of costly damages litigation associated with water-flow obstructions resulting from development or maintenance of public works, so long as that government

26

entity goes through a valid permit process intended to mitigate significant risks of flood damage to the travelling public and private property, is rationally related to this goal. Section 76-5-109(4), MCA, is rationally related to a legitimate government interest and Hamlin has therefore failed to show that it is unconstitutional.

¶41 *Issue Four: Did the District Court err in dismissing Hamlin's remaining nuisance claims?*

¶42 Hamlin also appeals the District Court's subsequent dismissal of Hamlin's remaining non-damage-seeking claims for public and private nuisance on summary judgment. We first address Hamlin's argument that the same questions of fact regarding causation that Hamlin asserts should have precluded summary judgment on inverse condemnation should likewise preclude summary judgment on Hamlin's nuisance claims for abatement. Because we have concluded that the District Court was correct that Hamlin failed to point to a material disputed fact as to the existence of causation between MDT's actions and Hamlin's alleged damages for purposes of inverse condemnation, the District Court was likewise correct to conclude that there is no dispute of fact material to the existence of that same causal connection for purposes of a nuisance claim.

¶43 Hamlin also argues, however, that the District Court erred in even considering the question of causation with regard to Hamlin's nuisance claims, asserting that MDT failed to raise the argument until its reply brief on its motion for summary judgment before the District Court.

¶44 Hamlin cites no authority supporting, even tangentially, this assertion of error for this issue on appeal. *See* M. R. App. P. 12(1)(g) (requiring the brief of the appellant to

contain an argument including, inter alia, "citations to the authorities . . . relied on" "with respect to the issues presented"); *623 Partners, LLC v. Hunter*, 2016 MT 336, ¶ 24, 386 Mont. 24, 32, 385 P.3d 963 ("It is not our responsibility 'to conduct legal research on behalf of a party or to develop legal analysis that might support a party's position.'" (quoting *State v. Gunderson*, 2010 MT 166, ¶ 12, 357 Mont. 142, 237 P.3d 74)). In any event, the issue of causation was plainly before the court; Hamlin addressed it during the summary judgment hearing, and it is not clear that the District Court even relied on the arguments made in MDT's reply brief in reaching its determination. The District Court relied heavily on *Barnes v. City of Thompson Falls*, 1999 MT 77, ¶ 26, 294 Mont. 76, 979 P.2d 1275, in its determination that Hamlin's remaining nuisance claims failed for lack of causation. It was Hamlin, not MDT, who cited to *Barnes* in briefing before the District Court with regard to nuisance.

¶45 *Issue Five: Did the District Court abuse its discretion in declining to consolidate Hamlin's two lawsuits?*

¶46 Hamlin twice moved to consolidate this case with a parallel suit Hamlin had brought against the County, pursuant to M. R. Civ. P. 42(a). The District Court denied both of these motions, ruling that the suits involved distinct questions of law and fact, that there was no risk of conflicting judgments, and that judicial economy would not be served by consolidation. Hamlin appeals these denials.[13] However, because we uphold the District

---

[13] On Hamlin's motion, MDT was added as a codefendant in the separate suit against the County. *See* Order on Motion to Join Montana Department of Transportation as a Defendant, *Hamlin v. Bd. of Cty. Comm'rs of Lewis and Clark Cty.*, No. DDV-2018-980 (Mont. First Judicial Dist. Filed Jul. 23, 2021).

Court's rulings dismissing each of Hamlin's claims against MDT, there is no longer any case for the parallel County suit to be consolidated with and the issue is now moot. *See In re Big Foot Dumpsters & Containers, LLC*, 2022 MT 67, ¶ 10, 408 Mont. 187, 507 P.3d 169 ("[W]hen an issue presented at an action's outset ceases to exist or is no longer 'live,' or if, due to a change in circumstances or some intervening event, the court cannot grant effective relief, the issue is moot." (citation omitted)). We therefore do not address the parties' arguments on this issue.

**CONCLUSION**

¶47 The District Court's orders of August 28, 2019 (dismissing negligence and negligent misrepresentation claims); November 27, 2019 (denying motion for declaratory judgment that § 76-5-109(4), MCA, is unconstitutional); June 24, 2020 (dismissing claim for unjust enrichment); and June 29, 2021 (dismissing Hamlin's claims for inverse condemnation and nuisance and dismissing Hamlin's suit against MDT) are affirmed. Because this case has been properly dismissed, issues surrounding the District Court's May 5, 2020 and March 29, 2021 orders denying Hamlin's motions to consolidate this case to a parallel matter are now moot and not reviewed here.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice Jim Rice has recused himself and did not participate in the decision of this case.

29